Good morning. We are very thankful to be sitting here at the University of Houston Law Center today. We're thankful to Dean Baines who has invited us, and we're thankful to the students and the faculty and the administrative people who have supported us. We appreciate specifically the help of Dean Tennessee and Ms. Martin, Samantha Martin, who have made us be able to do this. And so we're very grateful for this opportunity to sit here. Walking back to where we sit, where we have offices here, the great portrait of Mr. John O'Quinn looms in the hallway. And Judge Higginbotham and I both had the privilege of having John O'Quinn practice before us. And when I was a state judge, he tried cases before me, and so it brings back some memories. And it's such a lovely facility you have here. And hopefully, the reason we do this is because it provides us educational opportunities and civic engagement. Chief Justice Roberts has encouraged us to promote civic engagement with our court system so that people can understand what we do and how the rule of law works in action. So this is a community opportunity, and hopefully it will hopefully increase your understanding and perhaps all of our respect for the rule of law. Hopefully we won't do something that makes you not respect it. But thank you very much for having us. Dean, did you? You gave remarks already? Okay. Thank you very much, Dean. The first case for today is 2025-30104, United States of America v. Shaquayla Lewis. Did I pronounce that right? You did, Chief Judge. Okay. Thank you. We'll hear from Mr. Talbot. Good morning, Chief Judge, members of the Court, members of the University of Houston Law Center, may it please the Court. I'm Dustin Talbot, and I represent Shaquayla Lewis, who is serving a 27-month prison sentence after pleading guilty to committing a PPP loan fraud. The District Court called Ms. Lewis's scheme remarkably simple in approach. Then it applied the sophisticated means enhancement under the sentencing guidelines. That applies only to cases that are especially complex or especially intricate in its offense conduct. This Court should vacate Ms. Lewis's 27-month sentence and remand for a new sentencing hearing without the sophisticated means enhancement. I'll make two points today. First, the District Court committed clear error in applying the sophisticated means enhancement to Ms. Lewis's conduct under this Court's decision in Valdez, a decision written by Your Honor Judge Graves and joined by Your Honor Judge Higginbotham. And second, the Government has waived harmless error in this case, and even if it hadn't, the error is not harmless under Ivaro Luna. First, the Court erred in applying the sophisticated means enhancement under Valdez. The sentencing guidelines section 1B1.1B10 provides a two-level offense-level enhancement if the offense involves sophisticated means, and the commentary defines sophisticated means as especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense. The Court below rested its sophisticated means finding on three facts, and those facts are important to understand the enhancement. Ms. Lewis was a nurse, and as a side job, she had a business called Perfect Memories Travel, where she did vacation planning on the side. And this was a legitimate business. In 2019, she filed a Schedule C tax return where she reported $5,000 in gross revenue for that business. And then in 2020, she submitted a fraudulent PPP loan application where she attached a Schedule C form, which was the same one she had filed in her taxes the year before, but she had altered the number from showing $5,000 in gross receipts to over $140,000 in gross receipts. So your client created false employer identification numbers to request the PPP loans, is that right? No, Your Honor. This was an existing business that she owned before the PPP loan application, and it was a BBN. So she did not create any false employer identification numbers? No, Your Honor. She submitted this in the same, I guess, EIN or her own social security number, her own sole proprietorship that she submitted in 2019 with her tax returns for her Schedule C. Well, she didn't create any in connection with that business? That's correct. But you're not saying she didn't create any in connection with some of the other 16 or 17 loan applications? So the applications for other third parties, some of those did include fake EINs or fake businesses. That's correct. And she's the one who did that, right? Well, she certainly facilitated it. She's responsible for it. I think they were submitted by a third party, Ms. Wiggins, but she's responsible under relevant conduct provisions of the guideline for that conduct. Can you help us with some language in the Valdez case that you rely on? It says the enhancement can apply when the defendant applied some method that made it more difficult for the offense to be detected, even if that method was not by itself particularly sophisticated. This is at 726 F. 3rd at 695. How do you deal with that understanding of that case? Right. And so I think what this Court is saying in that quote in Valdez is that if the underlying conduct is not sophisticated, but that it makes the detection of the scheme more difficult, if it enhances the concealment, then that can be a means to apply sophisticated means. In Valdez, the underlying scheme was incredibly complex. It was a health care fraud scheme with a psychiatrist with numerous clinics who was billing for procedures that were different than the ones that were being conducted in his clinic. And that scheme was to the tune of about $13 million. And although the scheme was complex, right, the sophisticated means enhancement in that case was based on the fact that Dr. Valdez, when he received the money in his operating account for his business, he transferred that money into his personal investment account. And this Court said that that transfer of money, right, between his business operating account and his personal investment account, that that transfer is not sophisticated because both accounts were in his name, and that doesn't enhance the concealment or make it more difficult to detect the fraud. And that's exactly what Ms. Lewis does here, right? Ms. Lewis, when she receives the PPP loan money for Perfect Memories Travel, it goes into her Perfect Memories Travel account, and then she writes checks to herself personally from that account. Well, why did she go three months after the application and file papers with the Secretary of State's office with regard to her preexisting business? The record does not tell us why, right? It doesn't tell us why, but you're correct, Judge. After she submits the first draw PPP loan, a few months later, she registers her sole She also wrote fake checks to herself, which she designated as payroll to the guy's overall scheme. And as I looked at it, she submitted with the loan application receipts of $140,568, and the reality was she was only $5,000. And this is not just our oversight, and it involves very gross representations during the COVID effort. In other words, there's no question but that she's taking advantage of the monies that were designated for people that needed it in the COVID fund. We're only talking here about was it sophisticated. Well, Judge, everything you say is correct. When you move up in those numbers, you're playing at that game level, and then you quickly move away from the notion that this is some offhand, unsophisticated lady. She's going for the big bucks, so to speak. Now, how do you say to that? Well, your point's well taken, and the facts you're saying are correct, right? She without question defrauded the PPP loan program to the tune of changing the number $5,000 to $140,000. And that's true. That is the crime, right? The alteration of that number is the fraud. The question is... It is the crime, but when I'm talking to her, we're not talking nickels and dimes here. She's going for a lot of money. At least it is to me. It is a lot of money. Judge, I would say that the sophisticated means enhancement is not tethered to an amount of the fraud. It's not tethered to how much money is perceived. But, no, the amount does reflect the sophistication to get to that amount. In Valdez, the fraud amount was $13 million.  And this Court still found that it was not a sophisticated means. So I think that the ultimate amount of money that is recovered I think is not the correct question, respectfully, Your Honor. It's what sort of efforts were put into receiving that amount of money. And here she changed a number on a Schedule C form from $5,000 to $140,000. And then she writes checks to herself from that operating account to her personal account, which is what Dr. Valdez did in the Valdez case as well. But she also used several fake EINs and wrote in other documents, fake documents on Schedule C, W-3s, and EINs. She used a whole series of fake documents. It's not just she took money and put it in her account and then wrote checks to herself. That's not it. It required W-3s, EINs, Schedule Cs, a whole bunch of different corporate documents and tax documents, didn't it? Well, and maybe I can clear this up, Chief Judge. So I guess a lot of the things I'm talking about have to do with her Perfect Memories loan, right? And in that loan, those other documents are not fraudulent, right? The only fraud in the Perfect Memories loan is changing the Schedule C forms. But I think Your Honor is talking about these other loan applications that were submitted for third parties. Which is part of her scheme. It is. It's not what the court relied on.  I'm sorry, Judge. We can consider that, can't we? You can because the standard of review is clear air. You can consider the record as a whole. Those are not things that either the government or the judge relied on below to say that the scheme was sophisticated. The judge below said it was sophisticated because of her Schedule C form, because of her checks that she wrote to herself. Those weren't fake checks, right? Those were real checks that were written from her business operating account that was a legitimate business before the loan application to her personal account. But she did write payroll on the checks. That's correct, Your Honor. And she converted the funds to her own personal use. That's correct. She wrote payroll on those checks. In Valdez, the doctor did the same conversion, right? He converted the funds that he received for the health care fraud from his business operating account. He would quickly move them into his personal investment account to try to hide where that income was going, where that money was going. And I would argue that this is similar to that, right? She's moving funds from two accounts that are in her name that she controls, right? And the distinction I want to make is that she did not create a fake business, right? If we look at the commentary to sophisticated means, it says it ordinarily involves shell companies or fictitious entities. She used her real business, right? And then when she got the money, she did not send the money to her boyfriend or husband to try to divert the money away from her name. That's what happens in Miller. That's what happens in Clements, right? Instead, she writes the check to herself, right, which is what Dr. Valdez did. And so I think that those things are very analogous. But what about the – she did submit multiple fraudulent tax documents, including Schedule C forms, right? That's correct. And W-3s. That's correct for the third-party applications, yes. But that's part of the scheme that we're allowed to – the enhancement could be supported by the scheme. That's correct. Because it's plain error, isn't it? It's clear error. Clearer, clearer. Excuse me, clearer. And also fictitious EINs. So it was a whole series of fake documents that had to be generated to do this overall scheme. Yes. I think that's fair, Judge. Okay. And why isn't that enough for sophisticated means? Well, I would go back to the court precedent in Valdez. That case involves significantly more sophisticated fraudulent documents, right? Did it have a whole series of fraudulent documents like this one does? I think it had to, right? In Valdez, there's a complex scheme to defraud Medicare, right? Which means that, like, every single patient form that's being submitted to Medicare is fraudulent, right? It's fraudulently saying that one procedure was done when another procedure was actually done. The doctor had to train his employees on how to change those billing codes. There was a mass marketing scheme that was talked about in the decision. And so, you know, defrauding the Medicare program out of $13 million involved a significant sustained over, I think, maybe it was 18 months, you know, submitting fraudulent documents. And I would submit that this is a similar scheme with fewer fraudulent representations, right? It's just a loan application, and it has the necessary attached documents that are fraudulent. Every PPP loan has to have that documentation. And so, you know, that is the basic elements of the fraud. What would make it sophisticated is if she had, you know, done a bunch of these additional things to conceal where the money went, which is what happens in Miller and Clements. It's what happens in Wright, where there are other people who are receiving the money. The money is being submitted to other people to hide where it's going and hide the source of the money. Counsel, let's assume we agree with you that there was error. Would we be free to engage in a harmless error analysis to determine whether or not that error was a harmless error? Because that's what happened in Valdez, isn't it? Yes, Judge. I'm arguing that the government has waived that, but I believe that this Court is allowed to conduct its own analysis. This is clear error, right? So the Court gets to look at the entire record. But I think that it's without question it wouldn't be harmless error. In this case, the judge never says the famous inoculating statement that we always see, which is I would impose the same sentence regardless of the guidelines. And in this case, this guideline objection was heard in the district court. So the judge knew of the difference in the sentencing ranges. He never references the lower range. He never explains that he would give the same sentence. And so I think under Ivar Aluna, this case is harmless, right? It's a tough – it's not harmless. It's a tough standard on the government. Harmless both because the government forfeited the harmless error and government bears the burden on harmless error. That's correct. And then also because it's the bottom of the range, and then it would be the top of the range. That's correct. Right. And so there's no indication that it would be that – that that was the right number regardless. That's correct. There's no indication the judge would give a top-end sentence on remand instead of the bottom end, which is what it gave initially. And so if there's not further questions, I'll reserve the rest of my time for rebuttal. Thank you. Thank you, Mr. Talbot. We'll hear from Ms. Edwards. Good morning, and may it please the Court. Sarah Edwards on behalf of the United States this morning. I think I should probably start where Mr. Talbot did with the Valdez decision. And what I think is important to keep in mind about Valdez this morning is that it was not the complexity of the underlying fraud that drove the Court's decision in that case. It is true that Dr. Valdez's scheme was quite complex. I think it is also true that Ms. Lewis's scheme could be seen as maybe more complex than we've been talking about so far this morning. She recruited over a dozen other people. They filed 16 to 17 fraudulent loans to get government resources during the COVID-19 pandemic. And according to the PSR, which was adopted by the District Court, Ms. Lewis then got kickbacks for her role in recruiting other people. However, the count of conviction that Ms. Lewis pled to and that the District Court discussed in applying the sophisticated means enhancement was her own personal conduct related to the Perfect Memories Travel Agency. And in her conduct related to Perfect Memories Travel and the conduct discussed in Valdez, we see significant departure. Ms. Lewis, over a series of about 10 months, I believe, wrote multiple checks to herself that she had denoted as payroll. And the reason that she did that was because PPP loan proceeds can only be used for certain purposes. If you want to have the PPP loan forgiven, it could be used for rent, it could be used for payroll-specific eligible expenses. Therefore, by denoting those checks as payroll, and if you look, there's a table in the PSR, but you see she took other steps, right? It was the consistent amount. It was disguised to look as though it were a salary, when in fact Ms. Lewis was not a full-time employee of Perfect Memories. She had a full-time job as a nurse. And what she was doing was attempting to make it appear that this was a payroll expense for a fully-fledged business when that was not the case. Same with the registration after the fact. There were actually three fraudulent loans related to Perfect Memories during the course of the COVID-19 pandemic. Ms. Lewis's original May 2020 loan application attached the false schedule C form that your honors were discussing with Mr. Talbot. Then in the August-September timeframe, she also obtained an EIDL loan. And in February of 2021, she got a second-draw PPP loan, saying, I've used up my first draw for eligible expenses. She certified that the first loan had only been used for eligible expenses when that was not the case and obtained a second draw. The registration of Perfect Memories came in August of 2020, three months after the first application, and during about the same timeframe she was working on the EIDL application, in an effort, again, to make it appear that this entity was more of a legitimate, fully-fledged business, indeed one that had a full-time employee, than it actually was. And all those steps taken together made it more difficult to detect Ms. Lewis's fraudulent scheme, as the district court noted in sentencing. On the Schedule C that she submitted before she registered her business, I guess you don't have to have a registration with the Secretary of State's office in order to file Schedule C? It would appear so, Your Honor. I think the record is silent on that point, but she was able to do it. I'd also like to address the quote from the district court that Mr. Talbot raised. And Mr. Talbot said that the district court had characterized the scheme as remarkably simple in approach. I would respectfully urge Your Honors to go back to pages 245 and 246 of the sentencing transcript. Because we have both a, I believe there's a sealed and an unsealed sentencing transcript in this case, I think it is both pages 245, 246, and also pages 158, 159 are the same transcript. But you'll see that the district court was actually specifically focused on sophisticated means, not the overall scheme at that time. And immediately after the district court cited this Court's decision in Wright, it noted, yes, that the sophisticated means here were, quote, remarkably simple. The district court then went on for about the next page or so, explaining why the individual sophisticated means in this case nonetheless made it more difficult to detect the scheme, and when taken together, had the effect of disguising Ms. Lewis's actions. Therefore, under this Court's precedent in Wright, in which, similarly, I believe the Wright district court had characterized the defendant's efforts in that case as not rocket science or not brain surgery, and this Court determined that the district court's tepid language would not undo its well-founded finding of sophisticated means, particularly on clear error review. Could you help with something? I'm puzzled by your friend on the other side, Mr. Talbot's argument that we're really looking at her own transactions for her own business and not for the overall scheme. And that while we could consider it that no one else did or mentioned it, it seems to me that the district court specifically mentioned the 17 fraudulent PPP and EIDL program applications on behalf of all these others and also mentioned all of the Schedule C issues. So it seems that the district court was talking about all these other things at the hearing. So I'm confused as to why we would only look at her checks and her own personal memories or whatever it's called, business. I think that as you and Mr. Talbot were discussing, Chief Judge Elrod, this Court certainly can look at the entirety of the record. And I agree that the district court discussed the 16 to 17 loans. I think that specifically when we look at both the defendant and the government's briefing and then the passage at sentencing when the district court was focused on the three areas that Mr. Talbot and this Court has been focused on. But I agree that the district court at sentencing discussed the full range of the scheme, not only the 16 to 17 loans, but the fact that overall throughout the fraudulent scheme, Ms. Lewis and her co-conspirators took in about $1.2 million in fraudulent proceeds. The district court also fully adopted the factual findings in the pre-sentence report specifically discusses, as you've been noting, Chief Judge Elrod, that the defendant used multiple fraudulent tax documents, including Schedule C forms, W-3s, fictitious EINs, to request the PPP loans and EIDL. So I do think that the full range of conduct was discussed, although those three points were emphasized when the district court overruled the sophisticated means objection below. The counsel opposite argues that Valdez is controlling in this case. How do you distinguish Valdez? I think Valdez was simply a different situation, Your Honor. I agree that the underlying fraud scheme in Valdez was complex, but the underlying fraud scheme was not what this Court was looking at for purposes of sophisticated means. And the two underlying fraud schemes are just factually quite different. One was a sophisticated Medicare fraud. This was an ongoing and somewhat more wide-ranging, maybe more co-conspirator series of PPP loans. But if we focus on the sophisticated means enhancement, in Valdez, any sort of concealment that would have tended to make it more difficult to detect that Medicare fraud would have been, I guess, maintained as part of the medical practice, perhaps, before we got to the transfers at issue in the Valdez decision under sophisticated means, fake patient charts or misleading notes. None of that was what the District Court or this Court was considering in Valdez when it came to sophisticated means. The District Court in Valdez and Your Honor, in writing the decision, noted that the sole reason given in Valdez for the application of the sophisticated means enhancement was the series of transfers from Dr. Valdez's operating account into Dr. Valdez's investment account. And it was this open and transparent transfer of funds between two accounts in his name that this Court found would not support the sophisticated means enhancement. Here, of course, we have more than a series of arguably, I think Mr. Talbot and I have different views on that, series of transfers. But we have the fictitious tax documentation. We have the series of fake payroll checks. And we also have the after-the-fact registration. The series of fake payroll checks, which I believe Mr. Talbot was trying to analogize to the transfers in Valdez, are different because, as discussed, denoting a check, a payroll check, in the context of a paycheck protection program loan serves to further conceal the scheme. It is making it appear, falsely, that the funds are being used for an eligible expense when they are not. Dr. Valdez's transfers in no way contributed to the concealment of his scheme in that same way. Do you agree that there's no harmless error argument here, which is why you didn't brief it? The government concedes that if Your Honors were to disagree with me and find that the District Court had clearly erred, which for all the reasons we have been discussing, it did not, but if you were to disagree with me, we agree remand would be required. Yes. Thank you. If the panel has no further questions, I will yield the rest of my time and request that you affirm the District Court's decision. Thank you very much. We appreciate your argument, Ms. Edwards. And, Mr. Talbot, you save time for rebuttal, sir. Thank you, Chief Judge. Just two points I want to make on rebuttal. First, to try to answer Judge Graves' question about whether registration of a business is required to file the Schedule C. It's not. You could file Schedule C as a DBA or a sole proprietorship, which is what she had done in 2019. But what's really important about the registration of her business as an LLC in the summer of 2020 is you don't have to be registered as a business to get a PPP loan. That registration of the business has no effect at all on the fraud, right? She applied for the loan as a DBA, and that was appropriate. You could apply for PPP loans as a DBA or a sole proprietor or even a contractor. And so, you know, the government, despite the subjection occurring below, never introduced any evidence that her registering her business had any effect on the Small Business Association's ability to detect fraud, right? And that was their burden to show that. The second thing I want to talk about is Judge Elrod, you're, you know, you keep making this excellent point, which is that if we look beyond perfect memories, there's other evidence of these other 17 applications. And so you're correct, right? Under relevant conduct principles, this court can look at outside of just what she pled guilty to. She only pled guilty to the perfect memories. What I will say is that if you look at the Valdez decision, in Valdez there is significant other evidence in the record of sophistication, an incredible amount of sophistication. And this court focused in that case on just what the district court focused on, which was that the transfer of the money between his two accounts. And here the district court says there's three things. And he lists the three things. That's the three things we've been talking about. I respectfully don't think the district judge bases this decision at all on the other loan applications of the third parties. He bases it solely on these three things. And I think those three things are not sophisticated. Thank you very much. We have your argument. We appreciate it, Mr. Talbot. And we appreciate both the fine arguments in the case today and the cases submitted.